IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| TINA BABA, RAY RITZ, and JON TAYLOR, individually and behalf of all similarly situated individuals,<br><br>  Plaintiffs,<br><br>  v.<br><br>HEWLETT PACKARD COMPANY,<br><br>  Defendant. | No. C 09-5946 RS<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

This putative consumer class action arises out of Hewlett Packard's manufacture of tx2000 touch-screen notebook computers, at least some of which developed a "crazy cursor" problem, where electromagnetic interference created by another part of the computer would cause its cursor to migrate to the lower right-hand corner of the screen. HP moves for summary judgment on plaintiffs' three claims for breach of the implied warranty of merchantability, breach of express warranty, and violation of California's Unfair Competition Law (UCL), California Business and Professions Code §§ 17200, *et. seq.* Plaintiffs oppose the motion and move, over HP's opposition, for certification of this case as a class action, with separate classes for the UCL and express warranty claims and two subclasses for the implied warranty claim. Plaintiffs further move to file their motion for class certification under seal. Finally, HP moves to strike the declaration of

Plaintiffs' expert Mark Keith in support of the motion for class certification. For the reasons discussed below, the motion for summary judgment is granted.[1]

## II. BACKGROUND

HP shipped tx2000 model notebooks from January through October 2008, approximately 61,500 of which are estimated to have been sold to consumers. The cursors in at least some tx2000s would independently migrate to the bottom right corner of the screen. In December 2008, the company that manufactured the computers for HP determined that this crazy cursor problem was being caused by electromagnetic interference ("EMI") emanating from components on the motherboard and that a foil insert on the keyboard cover would block the EMI and resolve the problem. Plaintiffs dispute whether the fix was effective. In January 2009, HP issued advisories to its engineers and service providers describing the problem and the proposed solution. At the same time, it posted a notice to customers through its website advising them of the problem and inviting them to contact HP service and support for assistance. Approximately 8,150 tx2000 computers—those manufactured on or after June 1, 2008—had been built with a keyboard cover component that already included the corrective foil insert. In 2008, named plaintiffs Tina Baba, Ray Ritz, and Jon Taylor each bought a tx2000 manufactured on or before May 30, 2008, that experienced a "crazy cursor."

Each tx2000 was accompanied by a written limited warranty. The first page of the warranty reads, in capital letters, "EXCEPT AS EXPRESSLY SET FORTH IN THIS LIMITED WARRANTY, HP MAKES NO OTHER WARRANTIES OR CONDITIONS, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY." It continues, "ANY IMPLIED WARRANTIES THAT MAY BE IMPOSED BY LAW ARE LIMITED IN DURATION TO THE LIMITED WARRANTY PERIOD," of one year from the date of purchase.

---

[1] Because this order resolves the case, the deficiencies in Plaintiffs' motion for class certification need not be addressed and therefore the motion will be dismissed as moot. Similarly, HP's motion to strike the declaration of Plaintiffs' expert Mark Keith in support of the motion for class certification is subject to dismissal on the same grounds. Plaintiff's motion to seal their motion for class certification is denied, because HP did not file a declaration establishing that the information designated as confidential during the discovery process is sealable, as required by Civil Local Rule 79-5(d). Further, HP indicated at the hearing that the information was not sealable.

The computer is not warranted to be "uninterrupted or error-free." Rather, "HP will, at its discretion, repair or replace any component or hardware product that manifests a defect in materials or workmanship during the Limited Warranty Period." The warranty clarifies, "IF YOUR HP PRODUCT FAILS TO WORK AS WARRANTED ABOVE, YOUR SOLE AND EXCLUSIVE REMEDY (AT THE SOLE DISCRETION OF HP) SHALL BE ONE OF THE FOLLOWING: REPAIR OF THE HP PRODUCT, REPLACEMENT OF THE HP PRODUCT, OR A REFUND OF YOUR PURCHASE PRICE OR LEASE PAYMENTS (LESS INTEREST)." The limited warranty does not cover software problems.

A.  Plaintiff Taylor

Ohio resident Taylor bought his tx2000 in February 2008 from the HP website. Within a few weeks of purchasing it, he noticed the crazy cursor issue occurring. However, the cursor problems did not impede his use of the computer, which he continued to use "just as much as [he] expected to when he bought it." From April 2009 through June 2009, Taylor repeatedly contacted HP support regarding a different problem he was having with another HP computer he owned. During one of these discussions, he offhandedly mentioned the crazy cursor he was experiencing on his tx2000. The service representative to whom he was speaking erroneously suggested that the problem might be caused by a software problem, telling Taylor to look at his drivers or update the computer to resolve the issue. The representative did not tell him that the crazy cursor was caused by EMI, or that Taylor would need to send his computer in for a replacement part. Taylor did not contact HP again regarding his tx2000 and never sent it in for repair.

In April 2010, Taylor sold his tx2000 on eBay for $515, describing it as in excellent condition. In preparation for the sale, Taylor restored the computer to its factory settings. The buyer confirmed that Taylor's description of the product had been accurate.

B.  Plaintiff Ritz

Massachusetts resident Ritz purchased his tx2000 from HP in March 2008. The crazy cursor emerged a few months later. It became increasingly problematic and in December 2008, Ritz stopped using the computer for work purposes, but continued to use it for personal email and for games.

In June 2009, after the expiration of his one-year limited warranty, he contacted HP service about the cursor on the tx2000.  As with Taylor, HP service failed to identify the issue correctly as the hardware-based crazy cursor problem.  Ritz was told that he was probably touching the touchscreen accidentally and to desensitize the touchscreen or change the power settings.  Ritz declined to pay for an additional level of technical support in order to get further assistance.  He again contacted HP service through their website in June of 2009 and was directed to change the touchpad settings as well as verify that the correct touchpad software was installed.

C.  Plaintiff Baba

Arizona residents Baba and her husband, a semiconductor engineer, bought their tx2000 from a Sam's Club store in Arizona on November 29, 2008.  Although the crazy cursor problem arose three months later, they did not contact HP service until November 2009, at which point they called approximately five times in three or four days.  When HP service instructed Mr. Baba to make various software updates in order to cure the crazy cursor, he realized that such measures would not correct the problem.  When Mr. Baba insisted upon returning the computer, HP service told him first to take it to the Geek Squad at Best Buy for a second opinion.  The Geek Squad's verdict was that the crazy cursor was a known issue with tx2000s and irreparable.  The Babas subsequently insisted on sending the computer back to HP for a repair or replacement in November 2009.

When the computer was returned to the Babas, the screen had been replaced and the CPU speed diminished, but the crazy cursor remained.  Upon contacting HP again, the company gave the Babas the option of returning the computer immediately for another repair or extending its warranty for a year so that it could be returned for repair later at their convenience.  The Babas opted for the latter, and HP confirmed the warranty extension in writing.  Critically, however, the Babas did not provide the computer to HP for a second repair attempt.

### III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of

material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ. Proc. 56(c)(1)(A). If the movant succeeds, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3; *see also* Fed. R. Civ. Proc. 56(c)(1)(B). A genuine issue of material fact is one that could reasonably be resolved in favor of the nonmoving party, and which could "affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *See id.* at 255.

### IV. DISCUSSION

#### A. Implied Warranty of Merchantability

Plaintiffs Taylor and Ritz have alleged that HP breached its implied warranty of merchantability by selling them computers that developed crazy cursors. As each state has codified its own version of the implied warranty of merchantability in their respective adoptions of the Uniform Commercial Code, the claims of both Taylor and Ritz must be analyzed separately under the laws of their respective states of residence.

##### 1. Taylor's Claim Under Ohio Law

In Ohio, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Ohio R. C. § 1302.27(A). HP does not argue that the language of its limited warranty has in any way disclaimed this obligation under Ohio law. "[M]erchantable is not a synonym for perfect." *Lancaster Glass Corp. v. Phillips ECG, Inc.*, 835 F.2d 652, 661 (6th Cir. 1987) (quotation and citation omitted). "The mere manifestation of a defect by itself does not constitute a breach of the implied warranty of merchantability. Instead, there must be a fundamental defect that renders the product unfit for its ordinary purpose." *Tietsworth v. Sears, Roebuck and Co.,* 720 F. Supp. 2d 1123, 1142 (N.D. Cal. 2010) (internal quotation and citations omitted). There are several statutory factors that may be considered in determining whether a good is "merchantable," but the primary one is whether the item was "fit for the ordinary purposes for which such goods are used." Ohio R. C. § 1302.27 (B)(3). A "buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Ohio R. C. § 1302.65(C)(1). The

purpose of this notice requirement is to "afford the seller the opportunity to cure the claimed defects." *Abele v. Bayliner Marine Corp.*, 11 F. Supp. 2d 955, 960 (N.D. Ohio 1997). Accordingly, in order to establish a breach of the implied warranty of merchantability, the buyer must also prove "that the seller failed to repair the defects within a reasonable time or within a reasonable number of attempts. *Id.* at 961.

It is undisputed that Taylor's tx2000 had a crazy cursor, and that this was indeed a defect in the product. However, HP and Taylor dispute whether this is sufficient to create a question of material fact as to whether the computer is unmerchantable, in light of Taylor's continued use of the product and his description of it as in excellent condition when selling it. Similarly, the parties agree that Taylor mentioned the crazy cursor to HP service in the spring of 2009, but hold divergent positions as to whether Taylor sufficiently notified HP of the alleged breach. These issues, however, need not be reached as Taylor has failed to raise a question of material fact sufficient to survive summary judgment as to the final element of his claim—opportunity to cure.

When Taylor spoke to HP service about the cursor issue, they suggested a number of repairs that he could attempt himself at home. Ultimately, these proved ineffective against the crazy cursor because they were software fixes and the root cause of the problem lay in the tx2000's hardware. Taylor never again contacted HP or sought any further repairs for his cursor, though it continued to malfunction.

"Ordinarily, the issue of whether a seller has been given a reasonable opportunity to cure a consumer product's defects is a question for the finder of fact." *Id.* at 961. However, courts applying Ohio law have held "as a matter of law that Plaintiff did not afford [the] Defendant[] a sufficient opportunity to cure" where the buyer gave the seller only one chance to repair the item. *Id.* Because Taylor did not give HP "a second opportunity to repair or replace," as a matter of law he "fail[ed] to give Defendant[] a reasonable opportunity to cure." *Id.* 961, 962. Plaintiffs' insinuation that an additional opportunity to repair would have been futile does not excuse them from the failure to meet their burden on this element. Therefore, summary judgment is appropriate as to Taylor's breach of the implied warranty of merchantability claim.

### 2. Ritz's Claim Under Massachusetts Law

HP raises a different argument in support of its motion for summary judgment on Ritz's claim. It contends that under Massachusetts law, the wording of its limited liability warranty serves as a valid disclaimer of the implied warranty of merchantability enforceable against Ritz, because his computer is legally considered work equipment. Ritz counters that his tx2000 is properly classified as a consumer good, and Massachusetts law prohibits sellers from disclaiming implied warranties on such products.

The warranty that accompanied Ritz's tx2000 states "EXCEPT AS EXPRESSLY SET FORTH IN THIS LIMITED WARRANTY, HP MAKES NO OTHER WARRANTIES OR CONDITIONS, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY." This disclaimer is valid under Massachusetts law because it includes the word "merchantability" and is "conspicuous." Mass. Gen. Laws ch. 106 § 2-316(2) ("to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous"). This "[l]anguage in the body of a form " is in all capital letters and located on the first page of the warranty. Mass. Gen. Laws ch. 106 § 1-201(10); *see also Logan Equip. Corp. v. Simon Aerials, Inc.*, 736 F. Supp. 1188, 1197 (D. Mass 1990) (setting forth the factors that a court takes into account to determine whether warranty language is conspicuous, including the "location of the clause" and its "capitalization").

Still, no matter how conspicuous, in Massachusetts a disclaimer cannot relieve a seller of *consumer goods* of the implied warranty of merchantability. *See* Mass. Gen. Laws ch. 106 § 2-316A(2). Under the Massachusetts version of the Uniform Commercial Code, a "consumer good" is one "used or bought for use *primarily* for personal, family, or household purposes." Mass. Gen. Laws ch. 106 § 9-102(a)(23) (emphasis added).[2] The other mutually exclusive classes of goods are "Equipment," "Farm products," and "Inventory." Mass. Gen. Laws ch. 106 § 9-102(a)(33), (34), (48). The classification of a good is not its inherent nature, rather a given item will be classified differently under the U.C.C. in each case based on its use. "Goods can fall into different classes at

---

[2] This definition is codified in Article 9 of the U.C.C., which deals with security interests, but is specifically adopted by Article 2, governing sales. *See* Mass. Gen. Laws ch. 106 § 2-103(2).

different times. For example, a radio may be inventory in the hands of a dealer and consumer goods in the hands of a consumer." Uniform Comm. Code Comment 4(a) to Mass. Gen. Laws ch. 106 § 9-102. That said, the radio cannot simultaneously fall into two classes. "In borderline cases . . . the principal use to which the property is put is determinative." *Id.* For example, if a Doctor uses her car primarily for personal errands and travel, it is a consumer good, but if she uses it mostly to make house calls, it is equipment. *See id.*

Citing only *Kazmaier v. Connelly*, No. 91-7494, 1994 Mass. Super. LEXIS 668, at *1 (Mass. Super. Ct. May 24, 1994), an unpublished Massachusetts Superior Court order, Ritz argues that the question of which category in which a good falls is a question of fact for the jury. Ritz testified that he bought his tx2000 for work in March 2008. Indeed, Ritz claimed a tax deduction for the computer in light of its claimed use for his business purposes. He used it nearly every day for nine hours a day for business purposes through December 2008. At that time, he reduced his use of the tx2000 because of its crazy cursor, utilizing it according to his deposition testimony, only to read his "work email" and to play games.

In opposition to HP's motion for summary judgment, Ritz characterizes this testimony as describing exclusive use of the computer for business use for eight months, followed by solely personal use thereafter. Even drawing all inferences in favor of Ritz as the nonmoving party, this gloss on the facts is not sufficient to defeat summary judgment. Rather, Ritz "must do more than simply show that there is some metaphysical doubt" over whether the *primary* use of his tx2000 was personal. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Based on the record, "no one can seriously contend that [Ritz's tx2000]" was bought or used *primarily* for personal, family or household purposes and therefore "constitutes [a] consumer good[]," and the question may not proceed to a jury. *See New England Watch Corp. v. Honeywell, Inc.*, 11 Mass. App. Ct. 948, 948 (Mass. App. Ct. 1981). Because Ritz's tx2000 is "equipment," a "good[] other than inventory, farm products, or consumer goods," HP's disclaimer of the implied warranty of merchantability is enforceable. Mass. Gen. Laws ch. 106 § 9-102(33).

It is unnecessary to decide whether the Magnuson Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, nonetheless prohibits HP from disclaiming the implied warranty of merchantability. Even if

NO. C 09-5946 RS
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
8

the MMWA did apply, it would allow HP to limit the duration of the implied warranty of merchantability to one year—the duration of its written limited warranty. *See* U.S.C. § 2308(b). "[I]mplied warranties may be limited in duration to the duration of a written warranty of reasonable duration, if such limitation is conscionable and is set forth in clear and unmistakable language and prominently displayed on the face of the warranty." *Id.*; *see also Anderson v. Gulf Stream Coach, Inc.*, 662 F.3d 775, 784 (7th Cir. 2011) (noting the district court's holding that the MMWA proscribes disclaimers of the implied warranty of merchantability otherwise allowed under state law was not challenged on appeal, and commenting that the MMWA still allows implied warranties to be limited in duration). A one-year warranty is conscionable, especially given that the problem here arose within a matter of weeks or months for the named plaintiffs. Furthermore, the duration limitation is unmistakably and prominently displayed in a table on the top of the first page of the warranty. Ritz does not dispute that he did not contact HP regarding the crazy cursor until 15 months after he bought the computer.[3] Therefore, his implied warranty of merchantability claim would still be time-barred by the MMWA. Summary judgment on Ritz's implied warranty of merchantability claim is therefore granted.

B. Express Warranty

Plaintiff Baba claims that HP breached the express written warranty accompanying her tx2000 by failing to repair effectively the crazy cursor problem. It is unclear which law should apply in evaluating this claim. The Fourth Amended Complaint states that this claim is brought under the law of Arizona, where she resides. Yet Plaintiffs' motion for class certification (but not their opposition to summary judgment) argues for the application of California law to the express warranty claims of all class members, should a class be certified on this cause of action. Because

---

[3] At the hearing on this motion, Plaintiffs' counsel argued that Ritz's implied warranty of merchantability claim may proceed even though HP's implied warranty was limited in duration to one year and Ritz did not notify HP of the crazy cursor problem until 15 months after he bought it. Counsel's theory is that because the computer was defectively manufactured, HP breached the implied warranty of merchantability when it delivered the computer to Ritz, which occurred during the year-long warranty coverage. This argument is unavailing because selling a defective product does not in and of itself breach the implied warranty of merchantability. Instead, all of the elements of the claim—including notice of the defect and failure to cure—must occur for a breach to arise. Ritz's failure to fulfill the notice element of the claim during the warranty period is fatal to his claim.

1  neither party has identified any differences between California and Arizona law which are material
2  to the analysis of this issue, the choice of law determination need not be made at this stage in the
3  case.
4        HP denies that its express warranty even applies to the crazy cursor problem, and so argues
5  that it cannot have breached the warranty in the first instance.  The warranty guarantees that "HP
6  will, at its discretion repair or replace any component or hardware products that manifests a defect
7  in materials or workmanship during the Limited Warranty Period."  HP now contends that the crazy
8  cursor was not caused by a defect in materials or workmanship, because the computer was
9  manufactured in accordance with the product's intended specifications.  Rather, HP characterizes
10 the crazy cursor as a design defect, because the tx2000 manifested the problem when built as
11 designed from functioning parts.  This argument is unpersuasive.
12       The warranty makes no distinction between workmanship and design defects, and certainly
13 does not expressly exclude design defects from coverage.  It covers the hardware of the computer
14 for one year, specifically "HP warrants that the HP product and all the internal components of the
15 product that you have purchased . . . are free from defects in materials and workmanship under
16 normal use."  HP concedes that the crazy cursor constituted a defect in the tx2000 and the evidence
17 shows that it arose from an internal hardware component of the computer—specifically EMI
18 emanating from the motherboard used in tx2000s built on or before May 30, 2008.  In fact, none of
19 the tx2000s built on or after June 1, 2008, which included a new motherboard, experienced the crazy
20 cursor problem.  Regardless of whether the flaw in the initial motherboard is characterized as one in
21 its workmanship or its design, the motherboard constitutes a hardware "material" used in the tx2000
22 that malfunctioned under normal use.
23       Current briefing notwithstanding, HP has consistently maintained the position that the crazy
24 cursor issue was covered under its express warranty.  Its internal advisories pertaining to the crazy
25 cursor instructs service agents to provide replacement parts for tx2000s that are still "within
26 warranty."  Moreover, the course of dealing between HP and Baba establishes that *both* parties
27 interpreted the express warranty to cover the crazy cursor problem.  Had HP held a different
28 interpretation of the terms of the warranty, it would not have accepted Baba's tx2000 for repair

when it manifested the issue or have specifically extended the term of her limited warranty in order to allow for subsequent repairs. The limited warranty applies to the crazy cursor.

HP argues that even if the limited warranty applies, it was not breached because Baba failed to give HP a reasonable opportunity to repair her tx2000. In order to proceed on her express warranty cause of action, Baba must raise a question of material fact as to whether HP breached the warranty. As a matter of law, HP cannot have breached the warranty if it upheld its obligation to repair or replace the defective product. On the other hand, if HP "refused or otherwise failed to pay for the repair to a covered item," it would stand in breach. *Chaurasia v. General Motors Corp.*, 212 Ariz. 18, 22 (Ariz. Ct. App. 2006).

Plainly, the Babas were frustrated by their interactions with HP service, to say the least. Despite contacting HP service at least a half dozen times, going to Best Buy for a second opinion from the Geek Squad at HP's request, and sending in their tx2000 for a repair, the computer still was not fixed and its processing speed was actually reduced. After all of this, Baba reached out to HP service again, at which point HP offered to attempt to repair her computer once more and even extended her warranty period for an additional year at no cost so that she could seek the repair at a time convenient to her. The fact remains, however, that Baba never took HP up on its offer and failed to send in the computer for a subsequent repair attempt.

Baba discounts HP's second repair offer as "hardly satisfactory" because the HP service representative she spoke to told her that the company was not sure how to fix the problem at a time when it had already internally identified both the issue and the solution. Essentially, Baba argues that she called HP numerous times and was given the "run around." Having suffered a crisis of confidence in HP service, Baba contends that she was not required to give HP a second, likely futile, opportunity to fix her tx2000. While it is easy to empathize with Baba's palpable dissatisfaction with her HP service experience, she points to no authority that would excuse her from providing HP with a second opportunity to repair the computer.

In this case, Baba requested this second repair and HP *agreed* to perform it. The parties focus their briefing on whether Baba was required as a matter of law to provide HP in fact with a second opportunity to fix the computer. This misses the point. It is undisputed that, rather than

shirking its express warranty obligations, HP was willing to fulfill them. Baba testified, "they extended our warranty and I know they were still offering to fix the computer. . . . They didn't at any time say, no, we're not going to fix it." Therefore, summary judgment in favor of HP is appropriate on Baba's express warranty claim as a matter of law because the record is devoid of any evidence that would raise a question of material fact as to whether HP "refused or otherwise failed to pay for the [second requested] repair." *Id.*

### C.  UCL

Baba's remaining claim for relief is for a breach of California's Unfair Competition Law. *See* Cal. Bus. & Prof. Code § 17200 (broadly defining unfair competition to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising"). Specifically, the Fourth Amended Complaint alleges that HP engaged in an unfair business practice by "discouraging consumers from pursuing their rights under the warranty by providing incorrect information to those consumers about the cause of, and solutions to, the cursor malfunction, and by systematically and intentionally failing to adequately repair the computers" and by systematically breaching its implied and express warranties. Under the UCL, a business act or practice is unfair "if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits." *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1473 (2006). A breach of contract may form the basis of a UCL claim, "provided it also constitutes conduct that is unfair, fraudulent, or unlawful." *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1118 n.12 (C.D. Cal. 2001) (internal quotation and citation omitted); *see also Puentes v. Wells Fargo Home Mortg., Inc.*, 160 Cal. App. 4th 638, 645 (2008).

#### 1.  Application of UCL to non-resident plaintiff

The parties dispute whether the UCL can apply to a plaintiff such as Baba who is neither a California resident, nor who purchased her computer in California. Assuming *arguendo* that the UCL could be applied to Baba, her claim would still fail for the independent reason discussed below. Therefore, the question of whether there are sufficient facts in the record to establish that HP's alleged unfair acts "occurred in" California, such that the application of California law to its

conduct would be neither arbitrary nor unfair, need not be reached. *See generally NW Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 227 (Cal. App. Ct. 1999) (discussing due process limitations on the application of the UCL to out-of-state parties).

        2.   Standing

Baba argues that "the systematic nature" of HP's breach of its express and implied warranties provides a basis for finding HP's conduct unfair. *See*, *e.g.*, *Smith v. Wells Fargo Bank, N.A.*, 135 Cal. App. 4th 1463, 1483 (2005) ("[I]t appears that a systematic breach of certain types of contracts (e.g., breaches of standard consumer or producer contracts involved in a class action) can constitute an unfair business practice under the UCL."). In instances where an alleged breach of contract arises out of the defendant's interpretation of a particular provision in a consumer contract, then the act or practice of adopting that position may systematically affect a consumer class. *See*, *e.g.*, *Arce v. Kaiser Foundation Health Plan, Inc.*, 181 Cal. App. 4th 471, 489-490 (2010) (holding that the defendant's "alleged practice of categorically denying coverage" of certain services for autism-related disorders purportedly encompassed by the terms of a health care plan was sufficient to state a class action UCL claim); *Haggarty v. Wells Fargo Bank, N.A.*, No. C 10-02416 CRB, 2011 U.S. Dist. LEXIS 9962, at *14-*16 (N.D. Cal. Feb. 2, 2011) (denying motion to dismiss UCL claim based on alleged breach of the covenant of good faith and fair dealing where the defendant failed to exercise its discretionary authority to select a new index to which plaintiffs' interest rates were pegged).

"[W]here once 'any person acting for the interests of itself, its members or the general public" ([Cal. Bus. & Prof. Code] § 17535, as amended by Stats.1972, ch. 711, § 3, p. 1300) could sue [under the UCL], now standing is limited to 'any person who has suffered injury in fact and has lost money or property as a result of a violation of this chapter.'" *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 321 (2011) (quoting Cal. Bus. & Prof. Code § 17535, as amended by Prop. 64, § 5). In this case, Baba lacks standing to pursue a UCL claim on the basis of systemically breached express or implied warranties because any harm she suffered was not caused by such alleged unfair actions. Baba has not plead that HP breached its implied warranty of merchantability with respect to her computer, so she cannot establish that she "lost money or property as a result of the

defendant's unfair business practices" with regard to implied warranties. *Id.* As discussed above, Baba's express warranty claim fails because she failed to raise a question of material fact as to whether HP refused to repair or replace her tx2000. Since HP did not breach Baba's express warranty, she likewise cannot advance a UCL claim premised on such an injury.[4]

## V. CONCLUSION

HP's motion for summary judgment is granted as to each of plaintiffs' claims for relief.

IT IS SO ORDERED.

Dated: 10/26/12

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

---

[4] Counsel for Plaintiffs conceded at the hearing on this motion that if Baba's express warranty claim fails, she lacks standing to bring a UCL claim.